UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Vs. | ) | CR No. 1:20-00067-001 |
| | ) | |
| ABRAR ANJUM | ) | |

## SENTENCING MEMORANDUM

### I.    REQUEST FOR A SENTENCE OF TIME SERVED

Shortly, thirty-four-year-old Mr. Abrar Anjum will appear before this Court to be sentenced

in connection with his guilty plea conviction. He has admitted to the single count of Conspiracy

To Commit Wire Fraud.  Per the Plea Agreement entered into with the government in this case,

Mr. Anjum admitted to conspiring with Prince Sharma and Prem Mishra in a tech fraud scheme

that defrauded victims of a total loss of $26,627.  Mr. Anjum's specific role in said conspiracy

was to allow funds from victims to be deposited in bank accounts in Mr. Anjum's name, before

the funds were forwarded to Mr. Sharma and Mr. Mishra in India.

Mr. Anjum recognizes that the Court will impose a prison sentence in this case. The issue is:

how should the Court go about deciding a fair penalty – one that is punitive but not so punitive

that Mr. Anjum loses any real chance of turning his life around when he is released.

### II.    APPLICABLE LEGAL STANDARDS

"When a judge takes the bench with an opinion in hand, the obvious conclusion is that his

mind is already made up, that nothing the defendant or his attorney say will make any difference,

and that sentencing is just another step in a largely automated, impersonal process." United

States v. Wilson, 614 F.3d 219 (6th Cir. 2010). Mr. Anjum prays that the Court will not take an

automated approach to sentencing in this case. The Court is mandated to make an individualized sentencing decision and to be parsimonious when it comes to sentencing people. See United States v. Rodriguez, 527 F.3d 221, 228 (1st Cir. 2008). District courts must "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing," to fashion a sentence that is "sufficient but not greater than necessary" to achieve the goals of sentencing, considering (1) the nature and circumstances of the offense, the history and characteristics of the defendant; (2) the need for the sentence imposed to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (B) afford adequate deterrence to criminal conduct, (C) protect the public from further crimes of the defendant, and (D) provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the advisory sentencing guidelines range; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

While the Court must consider the recommendations set forth in the Federal Sentencing Guidelines, those Guidelines are merely advisory. United States v. Booker, 543 U.S. 220, 264 65 (2005). They are neither mandatory nor presumptively reasonable. See Nelson v. United States, 555 U.S. 350, 252 (2009) (per curiam). Moreover, the Court can reject any guideline based on sound policy reasons. Kimbrough v. United States, 552 U.S. 85, 111 (2007).

**III.    Time Served is A Reasonable Sentence in This Case in Light of Both, The Nature and Circumstances of the Offense, and The History and Characteristics of Mr. Anjum.**

As Your Honor is well aware, sentencing judges should not presume a guideline sentence will satisfy § 3553(a), because the guidelines are only "a rough approximation of sentences that might achieve § 3553(a)'s objectives." Rita v. United States, 551 U.S. 338, 351 (2007). The Court is free to reject a guideline sentence, "perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." Rita, 551 U.S. at 350-351. The sentencing judge has the authority to consider requests for below-guidelines sentences premised on disagreements with the manner in which the sentencing guidelines operate, including policy disagreements with them. United States v. Rodriguez, 527 F.3d 221, 2231 (1st Cir. 2008). For the reasons below, the Court should consider a sentence of time served.

   1. **Mr. Anjum Was A Minor Participant In This Conspiracy; Thus, His Offense Level Should Be Decreased By 2 Points.**

Mr. Anjum had a minor role in the tech fraud conspiracy before this Court, as his only responsibility was to open bank accounts for the tech support fraud money to pass through, before it was routed to its intended recipients--Prince Sharma and Prem Mirsha, in India. The Court should consider Mr. Anjum a minor participant in this conspiracy for the following reasons:

   1.  Mr. Sharma and Mr. Mirsha were the focus of the government's investigation;

   2.  Both men resided in India at the time of the tech fraud;

   3.  Per the plea agreement, the government has conceded that a substantial part of the scheme was committed outside the United States--specifically in India.

4. The majority of the money taken from fraud victims went to Mr. Sharma and Mr. Mirsha in India, while Mr. Anjum took a small percentage.

USSG §3B1.2 provides for a 2-4 point reduction in Offense Level that turns primarily on the defendant's particular role in the criminal activity, specifically whether he or she was a "minimal" or "minor" participant. *Id.*

On February 19, 2020, Mr. Anjum had a Probable Cause Hearing before this Court. At that hearing, Special Agent Craig Graham testified for the Government. (Transcript is attached as Exhibit A). During his testimony, Agent Graham informed the Court that his investigation into the tech fraud scheme now before this Court began in May of 2019. *Probable Cause Hearing, Page 7-8.* He went on to testify that the initial focus of the Government's investigation into tech fraud was directed at Prince Sharma and Prem Mishra, and not Mr. Anjum. *Id.* Later in his testimony, Agent Graham told the Court of his work with an informant. *Id* at p.12. This informant had informed the Government that he had a history dating back to at least 2017 with Mr. Sharma and Mr. Mishra, and that he knew they were committing tech fraud from India, but made no mention of Mr. Anjum. *Id.* at pp. 12-13. It was only later in the investigation that Mr. Anjum was identified as a participant in the scheme. However, his role seemed to me limited to using his bank account as a pass-through account for funds intended for Mr. Mirsha and Mr. Sharma, in India. Mr Anjum's role in the tech fraud scheme becomes evident during the testimony at Mr. Anjum's Probable Cause Hearing when Agent Graham was questioned about the temperament of Mr. Anjum regarding a certain fraud transaction:

> Q: You do know he seemed to be agitated that the rest of the money wasn't coming forward; correct?

A: Yes

Q: And he told you the reason he was acting agitated to get the rest of the money was because Mr. Mirsha, Prem Mirsha, was hounding him for that money, correct?

A: Yes, he did.

*Id.* at p. 34.

The fraud amount that was being discussed was for $7,000.00. After Mr. Anjum was arrested, he gave a four-hour interview to Agent Graham. At that interview, Mr. Anjum told the Government all he knew about his involvement with this tech fraud scheme, even transactions that the government did not know of. *Id* at p. 19.  Mr. Anjum also told Agent Graham that the arrangement between Mr. Anjum and Mr. Mirsha was that Mr. Anjum was to get 2.5% to 5% of the $7,000.00 discussed above, for allowing the fraud money to pass through his bank account. *Id.* at p. 34.  The nominal amount that Mr. Anjum received for his role in allowing his bank accounts to be used is indicative of Mr. Anjum's minimal role in the conspiracy when compared to Mr. Mirsha and Mr. Sharma.

Per the PSR, as drafted, Mr. Anjum has a Total Offense Level of 13. This would put his guideline range at 12-18 months to serve. However, if the Court were to find that Mr. Anjum was a minor participant under USSG §3B1.2 and reduce his Total Offense Level by 2 points, Mr. Anjum's guideline range would be 8-14 months.

2. **Mr. Anjum's bout With Covid 19, As Well As His Father's Condition Suggest A Sentence Of Time Served Is Appropriate.**

Mr. Anjum has experienced great hardship since his incarceration on February 4, 2020. More specifically, Mr. Anjum has had to serve a total of nine months during a global pandemic. Defendant submits that the threat of contracting and ultimat contracting of Covid 19 by Mr. Anjum while at the Wyatt Detention Facility, has made his nine-month incarceration a hard nine months.

Moreover, as was described in the PSR, Mr. Anjum's father in India is very ill. Mr. Anjum does not believe that his father has long to live and his father is said to be holding on, to see his son one last time. Mr. Anjum's father is currently treating with Skims Oncology in India.

Lastly, Mr. Anjum is a citizen of India. As a result of this arrest, an immigration detainer has been lodged. Because the crime of Conspiracy to Commit Wire Fraud is a crime of moral turpitude, Mr. Anjum will be deported after his sentence. The Court should consider that whatever sentence it imposes, Mr. Anjum will still have to serve additional time in custody as he goes through the deportation process. This is additional time away from his ill father. While it is important that the Court impose a sentence that reflects the seriousness of the charged offense, that consideration should be counterbalanced with the characteristics of the defendant. In this case, the Defendant is asking this Court to consider his bout with Covid 19; his father's failing health; and ultimate deportation in imposing a sentence of time served. The Defendant asserts that such a sentence would reflect both respect for the law, while taking into account the Defendant's specific characteristics and circumstance.

## IV.    CONCLUSION

For the reasons stated above, Mr. Anjum asks the Court to impose a sentence of time served. This sentence is sufficient but not greater than necessary in light of the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted
ABRAR ANJUM
By his attorney,
/s/ *Noah J. Kilroy*
Noah J. Kilroy, #9238
127 Dorrance St., Floor 4
Providence, RI 02903
noah@kilroylawfirm.com

**[Certification on next page]**

## CERTIFICATION

I hereby certify that a copy of this Memorandum was delivered by electronic notification to Milind Shah, Assistant United States Attorney on November 4, 2020.

*/s/ Noah J. Kilroy*

Case 1:20-cr-00067-JJM-LDA    Document 26    Filed 11/04/20    Page 9 of 44 PageID #: 248

# EXHIBIT A

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

* * * * * * * * * * * * * * *    MJ NO. 20-09-JJM
                                 *
UNITED STATES OF AMERICA         *
                                 *
    VS.                          *    FEBRUARY 19, 2020
                                 *
ABRAR ANJUM                      *
                                 *
* * * * * * * * * * * * * * *    PROVIDENCE, RI

BEFORE THE HONORABLE LINCOLN D. ALMOND,

MAGISTRATE JUDGE

(Preliminary Hearing)

**E X C E R P T**

APPEARANCES:

| | |
|---|---|
| FOR THE GOVERNMENT: | MILIND M. SHAH, AUSA<br>U.S. Attorney's Office<br>50 Kennedy Plaza<br>Providence, RI  02903 |
| FOR THE DEFENDANT: | KEVIN J. FITZGERALD, ESQ.<br>Federal Defender's Office<br>10 Weybosset Street<br>Providence, RI  02903 |
| Court Reporter: | Karen M. Wischnowsky, RPR-RMR-CRR<br>One Exchange Terrace<br>Providence, RI  02903 |

2

**I N D E X**

| GOVERNMENT WITNESS | PAGE |
|---|---|

Craig Graham
Direct Examination by Mr. Shah                      4
Cross-Examination by Mr. Fitzgerald            6
Redirect Examination by Mr. Shah             22
Recross-Examination by Mr. Fitzgerald    27

**E X H I B I T S**

| GOVERNMENT | FOR ID | IN FULL |
|---|---|---|
| 1 | | 6 |
| 2 | 27 | 29 |

19 FEBRUARY 2020 -- 11:00 A.M.

**BEGINNING OF EXCERPT**

THE COURT:  Good morning.  All right.  We're on the record for a preliminary hearing in the matter of the United States of America versus Abrar Anjum, case 20-MJ-09.

Can counsel present for this proceeding identify themselves for the record, please.

MR. SHAH:  Milind Shah for the United States, your Honor.  Good morning.

MR. FITZGERALD:  Kevin Fitzgerald for Mr. Anjum.

THE COURT:  All right.  Ready to proceed, Mr. Shah?

MR. SHAH:  I am.  Thank you, your Honor.

THE COURT:  Call a witness.

MR. SHAH:  The Government calls Special Agent Graham to the stand.

THE COURT:  If you could come forward, sir, and stand, the clerk will swear you in.

MR. SHAH:  Just for the record, that's Special Agent Craig Graham.

**CRAIG GRAHAM, GOVERNMENT WITNESS, SWORN**

THE CLERK:  Please state your name for the record.

THE WITNESS:  Craig Graham.

THE CLERK:  And spell your last name for me.

THE WITNESS:  G-R-A-H-A-M.

THE COURT:  All right.  You may proceed.

MR. SHAH:  Thank you, your Honor.

### DIRECT EXAMINATION

BY MR. SHAH:

Q.  Special Agent Graham, you are a special agent with the Federal Bureau of Investigation; is that correct?

A.  Correct.

Q.  And you've been a special agent with the Bureau how long?

A.  About 10 years.

Q.  And of those 10 years, how many have been spent in Providence?

A.  About the past two.

Q.  About the past two.  And of those two years in Providence, you have primarily focused on white collar investigations; is that correct?

A.  Correct.

Q.  Prior to these two years, you had white collar experience as well in your prior postings; is that correct?

A.  That's correct.

Q.  Since your time in the Providence office of the FBI, you've been involved in the investigation of

telemarketing fraud matters; is that correct?

A.   Yes.

Q.   And among those matters was a matter involving a target of investigation by the last name of Abrar Anjum; is that correct?

A.   Correct.

Q.   I'm showing you --

MR. SHAH:   May I approach, your Honor?

THE COURT:   You may.

Q.   I'm showing you what's been marked --

THE CLERK:   You have to be standing at a microphone.

THE COURT:   If you do it again, you have to buy Ms. Noel a cup of coffee, slice of pizza, what?

THE CLERK:   (Inaudible).

MR. SHAH:   On risk of doughnut sanctions, your Honor, I will remain at the mike when speaking.

THE COURT:   Thank you.

Q.   Special Agent Graham, you have before you Government Exhibit 1.  It is a criminal complaint along with the supporting affidavit naming as Defendant Abrar Anjum; is that correct?

A.   That's correct.

Q.   And is that your affidavit attached to that complaint?

6

A.    Yes.

Q.    Is there anything in that affidavit that you wish to correct or amend at this time?

A.    No.

Q.    Is everything in the affidavit true and correct to the best of your knowledge?

A.    Yes, it is.

MR. SHAH:  Your Honor, the Government submits Exhibit 1 --

THE COURT:  All right.  Government Exhibit --

MR. SHAH:  -- in support of probable cause.

THE COURT:  Government Exhibit 1, is there any objection to that being a full exhibit?

MR. FITZGERALD:  No objection, your Honor.

THE COURT:  All right.  So Government 1 will be a full exhibit.

(Government's Exhibit 1 admitted in full)

THE COURT:  Continue.  Thank you, Ms. Noel.

MR. SHAH:  The Government at this time has no further questions.

THE COURT:  Mr. Fitzgerald, do you have any questions for the agent?

<u>CROSS-EXAMINATION</u>

<u>BY MR. FITZGERALD</u>:

Q.    Do you have the exhibit there in front of you

still, sir?

A.    Yes, I do.

Q.    Can you go to page 39.

A.    I'm there.

Q.    Do you see paragraph 93 there?

A.    Yes.

Q.    And the date attached to that is January 8th, 2019?

A.    That's correct.

Q.    And the chats below -- I guess chats below were all from 2019, January 2019?

A.    Correct.

Q.    Are those dates correct?

A.    No, that would be January 2020.

Q.    Okay.  So is there anything else in the complaint that might not be right?

A.    Not that I know of.

Q.    Agent Graham, in your complaint, if you could just put this aside unless we need it --

A.    Yup.

Q.    -- you talk about this investigation was in two parts?

A.    Yes.

Q.    The first part was reviewing records and recordings about two individuals, Prince Sharma and a

8

Prem Mishra; correct?

A.    Yes.

Q.    All right.  When did that start?

A.    So the -- I guess that would have started around May 2019.

Q.    Okay.  And it's -- I'm correct in saying that that first part of the investigation had nothing to do with Mr. Anjum; correct?

A.    Correct.  Mr. Anjum didn't enter the investigation until approximately September.

Q.    The second part of the investigation in your complaint says it involved using an informant at your direction who offered Mr. Sharma, I think it's Prince Sharma, a bank account to use to funnel money; correct?

A.    Correct.  I'm not sure if Mr. Sharma requested the account or if the informant initiated that.

Q.    Can you look at page 2 of your complaint.

A.    Yes.

Q.    Paragraph 6.  Just read the first sentence to yourself.

A.    Yes.

Q.    Okay.  Does that help you remember whether or not Mr. Sharma asked for that account or the informant offered the account?

A.    I believe he -- the informant offered the account.

Q.    All right.  So the informant, who was in custody at that point in time; correct?

A.    Correct.

Q.    Working as the agent for the FBI; correct?

A.    Yes.

Q.    Offered this account to Mr. Sharma to funnel money that he had gotten from victims; correct?

A.    Yes.

Q.    All right.  Why would Mr. Sharma need this account?

A.    To -- I believe it's to get money from victims based in the U.S. back to India.

Q.    Okay.  The count that we're talking about that the informant offered up to Mr. Sharma, who was the name on the account?

A.    I believe that account was Michael Lobo.

THE COURT:  What was the name, Agent?

THE WITNESS:  Michael Lobo.  It's a fictitious name, your Honor.

THE COURT:  Yup.  Thank you.

Q.    That's what I was going to ask.  Mr. Lobo was a fictitious person?

A.    Correct.

Q.    This is an account that was set up by the FBI; correct?

10

A.    Yes.  Yes.

Q.    And then offered up to Mr. Sharma for this purpose?

A.    Yes.

Q.    So the money would go from Mr. Sharma to the account?

A.    No.  It would go from the victim to the account.

Q.    And then where would it go after it went to the account?

A.    When it was set up and provided to Sharma, it would have been left up to his direction where the money would go, Mr. Sharma's direction.

Q.    All right.  Can you just be more specific when you say -- where did he send the money to after that? Where did he direct the money to go to from there?

A.    I'm not sure if I'm clear on your question, but if you're referring to the 15,000, no.

Q.    Let me go back.  I'm not referring to anything specific -- a specific instance.

A.    Yes.

Q.    But I am referring to money would go from the victim to the Lobo account?

A.    Yes.

Q.    And then it would go somewhere after that?

A.    Right.

Q.    Where would it go?

A.    So it was not directed by Mr. Sharma at that time. It was left -- when the account information was provided, since no money hit the account for Mr. Sharma, he had not directed where it would go.

Q.    Ever?

A.    Correct.

Q.    Okay.  So what was the intent of having this account, then?

A.    What was the FBI's intent?

Q.    No, no, no.  I think we all know what the FBI's intent was.  What was the purpose of having this other account in Mr. Lobo's name?

A.    So I guess if I can speak on background, in these types of schemes, the individuals who are perpetrating them often look for accounts, U.S. accounts, for money to pass through, for victim money to go into the account and then directed to India.

Q.    Okay.  And why would somebody do that?  Why would somebody put money into an account in somebody else's name?

A.    There's a couple reasons.  A lot of actors in India don't have U.S. accounts, and it could also be used to separate themselves from the victim.

Q.    Okay.  So in this case Mr. Sharma could use the

Lobo account to protect himself; correct?

A.    Correct.

Q.    Because the Lobo account, obviously it's not Mr. Sharma's account?

A.    Correct.

Q.    It's Mr. Lobo?

A.    Correct.

Q.    Okay.  And then the money would go from the Lobo account overseas?

A.    So it would go, for this investigation, where the user of the account directed it.

Q.    Okay.  All right.  So when you started working with the informant in, I believe it was, May of 2019, he gave you the name of Mr. Sharma; correct?

A.    Correct.

Q.    And he also gave you the name of Mr. Mishra, too; correct?

A.    Yeah.  At some point in the investigation he provided the name Mishra.

Q.    And the informant told you that Mr. Mishra and Mr. Sharma were involved in tech support fraud; correct?

A.    Yes.  When he first identified them, he generally identified them as, yes, involving tech support fraud.

Q.    He didn't provide you the name of Mr. Anjum?

A.    No, he did not.

Q.    But he did tell you that he had a history with both Mr. Sharma and Mr. Mishra going back at least as far as 2017; correct?

A.    Yes, that's correct.

        MR. FITZGERALD:  One moment, please, your Honor.

        THE COURT:  Sure.  Take your time.

        (Pause)

Q.    Okay.  During May through June and July of 2019, there was communication between Prince Sharma and the informant; correct?

A.    Correct.

Q.    And they talked about using this Lobo account to route money, to funnel money; correct?

A.    Yes.

Q.    All right.  Was there no actual money moved during that time?

A.    That's correct.  There was not.

Q.    There was discussion about a large amount of money, several hundred thousand dollars; correct?

A.    Yes.

Q.    But that wasn't -- that didn't happen?

A.    No, I don't -- yeah.  I don't think any -- there was a lot of discussion of use of the account, but I don't think it was ever actually used by Mr. Sharma.

14

Q.    Okay.  And so then the actual use of the Lobo account didn't occur until this $15,000 check about five or six months later; correct?

A.    So it was used in the investigation; but with these subjects, that was the first time money was transferred into it.  However, verification amounts were transferred also.

Q.    All right.  Let me take a step back for a second.  This informant was involved in a number of different investigations; correct?

A.    Yes.

Q.    All the same kind of investigations, but much -- lots of different people?

A.    Correct.

Q.    All right.  How many different investigations?

A.    I would say at least seven, seven to nine subjects.  Not all of them were connected, though.

Q.    So there was money routed through the Lobo account that had nothing to do with Mr. Anjum?

A.    That's correct.

Q.    Okay.  And then we have this $15,000 check that gets routed into the Lobo account?

A.    Yes.  It was received by the bank in a physical form.

Q.    And that was in November of 2019?

A.    Yes, or -- I'd have to I guess refer to the exact date.  I'm not sure if that was when the bank received it or -- the bank might have received it in late October.

Q.    Okay.  I'm not trying to hammer you down to November or October.  It was in that timeframe; right?

A.    Yes, it was.

Q.    Now, was the -- the $15,000 check was never actually cashed; correct?

A.    Correct.

Q.    But there was $7,000 that was moved from the Lobo account to the next account in the chain; correct?

A.    So the 7,000 was not -- did not come from the Lobo account.

Q.    Okay.  I understand it was FBI money; correct?

A.    Yes.

Q.    It came from some other account?

A.    Came from another account, yes.

Q.    The informant made it appear that it came from the Lobo account and then went to the next account in the chain; correct?

A.    No, I don't think that's accurate.  The informant, I would say, made it appear that it was coming from him; but it was -- he didn't make it appear that it was coming from the Lobo account.

Q.    Would Mr. Sharma on the other end know whether it came from the Lobo account or just from the informant or would all he know is he got $7,000?

A.    So it would have depended on how it entered the account.  So that money went to an account controlled by Mr. Anjum, and he was able to tell that it came from a different (indiscernible) than Mr. Lobo.

Q.    And Mr. Sharma said to send it to Mr. Anjum's account?

A.    No.  I believe it was Mr. Anjum who provided the account information.

Q.    Right, at Mr. Sharma's behest?

A.    I don't know that.

Q.    Well, you know that Mr. Sharma put Mr. Anjum up as his connection in the United States or his guy in the United States, if I can get a -- Prince's U.S. guy was one of his chat handles; correct?

A.    So that handle was created by the -- I believe that handle was created by the informant, yes.

Q.    Okay.  Prior to this $7,000 and the $15,000, Mr. Anjum had no contact with the informant; correct?

A.    So that chat group was created in September, so he had communication with him before that transfer.

Q.    Let me ask you a different way.  You know that Mr. Sharma told Mr. Anjum to arrange for this money to

be put into his account, Mr. Anjum's account; correct?

A.    No, I do not know that.

Q.    Okay.  What do you believe?

A.    So I don't know whether Mr. Anjum was directed to do that by Mr. Sharma or not.  I know that Mr. Anjum requested the money, provided a bank account with his name on it for it to be transferred to.

THE COURT:  This is the $15,000 check that came from the actual victim PH?

THE WITNESS:  Yes.  That's -- the money that he was requesting was transferred, to be transferred, and then he was actually --

THE COURT:  From the Lobo account?  That money actually came from the victim to the Lobo account?

THE WITNESS:  So that money came in the form of a physical check to the bank where the Lobo account was at.

THE COURT:  Okay.

THE WITNESS:  That check was never cashed.  However, both Mr. Sharma and Anjum were --

THE COURT:  Inquiring about where the money was?

THE WITNESS:  Yes, and they were told that it was cashed, and then $7,000 of the Government's money was transferred from a different bank account to Mr. Anjum's bank account.

18

THE COURT:  Thank you.

Q.   Okay.  Mr. Sharma was involved in this transaction; correct?

A.   He was on the group chat, the group chats.

Q.   So Mr. Anjum asked for that money to be sent to his own account, correct, Mr. Anjum's account?

A.   Yes.

Q.   An account that was in his name?

A.   Yes.

Q.   In the United States?

A.   Yes.

Q.   Okay.  So whereas Mr. Lobo's account was used to perhaps hide who was getting the money, Mr. Anjum used his own account with his own name on it; right?

A.   Yes.

Q.   Okay.  Do you know where the money went to after that?

A.   After it hit Mr. Anjum's account?

Q.   Yes.

A.   So I believe it was -- his account shows 7,000 being deposited and then amounts equalling 7,000 I believe going to two other bank accounts in his name and then the transfer into a money service that sends money overseas.

Q.   Okay.  So from one of his accounts to two other

19

accounts in his name?

A.    Yes, if that's all -- all I see is the transfers. If that's representative of the 7,000, then yes, they would go to his -- those two accounts.

Q.    Okay.  And you arrested Mr. Anjum; correct?

A.    Yes, I did.

Q.    And you spoke to him for about four hours after he was arrested?

A.    Yes.

Q.    He waived his rights and talked to you?

A.    Yes.

Q.    He allowed you to search his luggage?

A.    Yes, he did.

Q.    Allowed you to search his phone?

A.    Yes, he did.

Q.    He waived his rights to be seen in New York and be transported up here to Rhode Island?

A.    Yes, he did.

Q.    And he actually disclosed other transactions to you that you didn't even know about?

A.    Yes, he did.

Q.    He told you that he didn't -- at some point he felt that these transactions, there was something wrong with them; correct?

A.    Yes.

Q.    And he stopped doing it; right?

A.    Yes.  He told me that there were a number of other transactions that he felt something was fishy or suspect about them.

Q.    Right.  And then he stopped doing it?

A.    So he had mentioned during our interview that the transactions in September, October were also -- caused him concern because they resulted in his bank account being frozen, but then he continued to do it after that.

Q.    Okay.  So when did you interview him?  When was that?

A.    It was I believe February 3rd, approximately 8 p.m., 9 p.m.

Q.    Two weeks ago?

A.    Yes.

Q.    Okay.  And the conversation, the communications back and forth about this $15,000 check was in November, December; correct?

A.    Are you referring to the chats or --

Q.    Right.  The check that came in, the $7,000, all that, all those communications about that transaction were November, December?

A.    Yes.  They might have gone into early January, but that was the bulk of them, November, December.

Q.    Okay.  And there's nothing after that for a month?

A.    So I believe during the interview he identified some transactions that occurred in January.  I'm sorry, in December.

Q.    In December?

A.    Yes.

Q.    Right.  So for the whole month of January, there was nothing?

A.    Nothing that I know of, that's correct.

Q.    So he told you he had stopped.  You just don't know if he did or not?

A.    Correct.

Q.    And he also told you that he didn't know the source of the money that was coming to him; correct?

A.    He stated that he didn't know what the victims were being told.

Q.    Well, he didn't know they were victims?

A.    Correct.  The people who were transferring the money, he did not know what they were being told.

Q.    That's correct.  And he told you that multiple times; right?

A.    Yes, he did.

Q.    Do you want to guess about how many times?

A.    It would be a guess.  I would say five.

Q.    Maybe more than 10?

22

A.    It could have been.

Q.    Okay.  During your interview, I know it's a long interview, but during that time he would say, I don't know where the money was coming from, I didn't know what Prince and Prem were doing, and you would say, I don't believe you.  Right?

A.    That's correct.

Q.    Multiple times that happened?

A.    Yes.

MR. FITZGERALD:  Okay.  One second, please, Judge.

THE COURT:  Okay.

(Pause)

MR. FITZGERALD:  I don't any other questions.  Thank you.

THE COURT:  All right.  Any redirect, Mr. Shah?

MR. SHAH:  Briefly, your Honor.

#### REDIRECT EXAMINATION

BY MR. SHAH:

Q.    Special Agent Graham, during the course of this investigation, did Mr. Sharma at any point characterize his relationship to Mr. Anjum?

A.    Yes, he did.

Q.    How did he describe his relationship to Mr. Anjum during the course of this investigation?

23

A.    He characterized it as that Mr. Anjum and Mr. Mishra were partners.

Q.    At any point during this investigation did Mr. Mishra characterize his relationship with Mr. Anjum?

A.    He did.

Q.    How did he characterize it?

A.    He characterized it as I believe the three of them were working together, that -- he identified that he was working with Mr. Sharma and Mr. Anjum.

Q.    With respect to the $7,000 that was routed to Mr. Anjum's account, in what form was that money routed?

A.    It was a wire transfer.

Q.    And what account was that money -- let me be more specific.  Was that money being wired from the Lobo account?

A.    No, it was not.

Q.    It was being transferred from an FBI account; is that correct?

A.    Yes.

Q.    And did that FBI account, without specifying the name, have a name that was attached to it?

A.    Yes.  It also had a fictitious name.

Q.    Okay.  And that would be a name that was not

24

Michael Lobo?

A.   Correct.

Q.   So to be clear about this, the money comes in the form of a check in the name of the victim, $15,000.  It is sent to the bank that holds the covert account that was being used as part of this investigation, that is, the Michael Lobo account; correct?

A.   Correct.

Q.   The check was never deposited?

A.   Correct.

Q.   Then when it came time to pay the conspirators, including Mr. Anjum, a $7,000 check was sent to Mr. Anjum; correct?

A.   A wire -- a $7,000 wire transfer was.

Q.   Yes, a wire transfer.  And that wire transfer was not in the name of Michael Lobo?

A.   Correct.

Q.   Was Mr. Anjum made aware of the name of --

A.   He was not provided the name by the informant.

Q.   Would he have had access to the name?

A.   Depending on his bank account, many times wire transfers have the name of the accountholder the wire's coming from.

Q.   Would it have had the account number that it was coming from?

A.    Most likely it would have.

Q.    And was the account information of the covert account, the name on the covert account, ever communicated to Mr. Anjum?

A.    No, not -- no, it was not.

Q.    When you spoke to Mr. Anjum after he was arrested, he detailed that his account had been frozen; is that correct?

A.    Yes.  One of his bank accounts had been.

Q.    The sequence events when something like this in the September timeframe, he did a series of transactions at Mr. Prince or Mishra's behest; is that correct?

A.    Yes.  Yes, that's what he told me in the interview.

Q.    And some of those transactions resulted in his account being frozen; is that correct?

A.    Yes.

Q.    He also told you that he thought that some of that money was improper or those transactions were somehow improper; is that correct?

A.    He said that he was I guess concerned about the transactions or he feared that they were improper because two transactions came from the same person.

Q.    So he thought there was something improper about

at least some of those transactions. His account ended up being frozen, and then it got unfrozen, and then he did more transactions at the behest of Mr. Sharma and Mr. Mishra; is that correct?

A.    Correct.

Q.    Now, he told you in his post-arrest interview that he didn't know what was being said to the people who were sending the money; is that correct?

A.    That's correct.

Q.    With respect to the $7,000 that he received, did he have any communications with the informant as to whether the $15,000 the seven was being drawn from, whether that $15,000 was fraudulent or its source was somehow improper?

A.    So he had a communication with the informant that I believe would have made it obvious that it was fraudulently derived.

Q.    Can you describe that communication.

A.    So in that communication, Mr. Anjum replied or sent a message that the money didn't come -- the 7,000 didn't come from Mr. Lobo's account, it came from someone else's account.

I believe he accused the informant of messing around or not fulfilling his side of the bargain, and then the informant replied to the effect that it was

27

fraud money so it shouldn't come from the same account that it was deposited into.  And then I believe Mr. Anjum replied something along the lines of thank you for being smart.

THE COURT:  Is this in the affidavit or is this a communication that you have a record of but it's not -- wasn't set forth in the affidavit?

MR. SHAH:  Your Honor, it's not set forth in the affidavit.  I have a record of the communication in my hand.  May I introduce it as an exhibit, Exhibit 2, please, after authenticating it with the witness.

THE COURT:  Yeah.  So it will be marked Exhibit 2 for identification.  Present it to the witness, and ask him questions, and we'll see where it leads us.

(Government's Exhibit 2 marked for ID)

Q.    I'm showing you what's been marked for identification as Government Exhibit 2.  Do you recognize that?

A.    Yes, I do.

Q.    It's a text exchange between Mr. Anjum and the informant; is that correct?

A.    Yes.  It's from the group.  So Mr. Sharma is also part of that group.

Q.    Can you explain what this group communication is

28

and how it works.

A.   In the communications between the informant and Mr. Sharma, they were communicating through an application called WhatsApp.  At one point Mr. Sharma identified another individual that he was working with and said that he would create a group with all three of them.  He created this group with Mr. Sharma, Mr. Anjum and the informant.

Q.   So it's Mr. Sharma who added Anjum to this group chat?

A.   Yes.

Q.   Can you specify roughly the timeframe of the relevant communication, namely the communication where the informant says, It's fraudulent money, I wouldn't just -- we're talking about fraudulent money here, and Mr. Anjum replies, Thank you for being so smart?  Can you specify the rough timeframe of those communications?

A.   It was after the 15,000 check did come to the covert account and after the 7,000 had been transferred to Mr. Anjum's account.

Q.   Can you tell me roughly a time period?  Is it November, December?

A.   I believe it's sometime in December.  There may be dates if I can take a look.

Q.    Please, go ahead.

A.    There's no dates on the messages, but I believe it was late November, sometime in December.

Q.    And can you read the text message just before --

THE COURT:  If you're going to -- I'd rather just see it than have him read it.  So if you have a motion to make it a full exhibit, make your motion. I'll hear the Defendant's position, and I'll decide whether or not to admit it as an exhibit before I either see it or hear it ·from him.

MR. SHAH:  The Government moves Exhibit 2 full.

THE COURT:  All right.  Any objection?

MR. FITZGERALD:  No, your Honor.

THE COURT:  So Government 2 will be full.

Ms. Noel, why don't you retrieve it from the witness, and I'll take a look at it.  If I have any question about the relevant portion or how to decipher it, I will either ask Mr. Shah to ask a question or ask a question myself.

(Government's Exhibit 2 admitted in full)

(Pause)

THE COURT:  All right.  Agent, I'm just going to ask you a couple questions so I can understand the context of this.  Let me ask -- the first question I want to ask is, was the amount of $7,000 sent for some

particular reason related to the investigation or was that the amount of money that you were able to obtain in government funds or the amount you were willing to risk in government funds to further the investigation?

THE WITNESS: That was the amount that we determined we could pay out. There was no -- other than our internal factor, there's no significance for the amount of $7,000.

THE COURT: All right. So the fact that a $15,000 check went and then 7,000 came, if I'm reading these text exchanges in the group chat accurately, it seems like that created some friction between the informant and Mr. Anjum about the amount and the source of it. Is that a fair statement?

THE WITNESS: Yes.

THE COURT: And then the informant appears to be trying to cover his tracks to explain why it was only 7,000 and why it came from a different account, and ultimately that explanation is accepted by Mr. Anjum. Is that a fair reading?

THE WITNESS: Yes.

THE COURT: All right. I don't have anything further.

MR. SHAH: Thank you, your Honor.

Q. Last few questions. In tracing the money, the

7,000 that went to Mr. Anjum's account, you said some part -- following the 7,000 deposited into Mr. Anjum's account, there were withdrawals from Mr. Anjum's account, two transmissions of money to other accounts that Mr. Anjum held?

A.    Yes.

Q.    As well as a transmission to a money -- a money transfer service?

A.    Yes.  I believe it's called Remitly, which is a company that offers overseas transfers.

Q.    Now, did Mr. Anjum explain to you whether he was getting paid for the money that came into his account and that he then transferred elsewhere?

A.    So, in general, he said that the transfers that Mr. Mishra directed him to his accounts, that he had an arrangement to receive 25 percent of them.

        This transfer of 7,000, he indicated that there was an arrangement of I believe two-and-a-half to five percent, but he did state that he didn't receive any percentage of that 7,000.

Q.    So he collected a fee for money that's siphoned through his account, generally speaking?

A.    That's what he said during the interview, yes.

Q.    And then the money would -- some of it would perhaps go to a money remittance service; correct?

A.    During the interview, he said that he transferred it to his account in India and then it went to Mr. Mishra.

MR. SHAH:    Understood.    No further questions, your Honor.

THE COURT:    All right.    I'll give you some leeway on recross.

MR. FITZGERALD:    Thanks, Judge.

THE COURT:    Yes.

**RECROSS-EXAMINATION**

**BY MR. FITZGERALD:**

Q.    All right.    I think you said -- you answered a question that at some point in time Mr. Mishra -- I'm sorry, Mr. Sharma, Prince Sharma, said that he and Mr. Anjum were 60/40 partners; correct?

A.    I believe it was Mr. Sharma told the informant that Mr. Mishra and Mr. Anjum were 60/40 partners.

Q.    Okay.    I'm sorry.    Can you say that again. Mr. Sharma said that the other two were 60/40 partners?

A.    Yes, I -- yes, I think so.

Q.    And then at some point -- at another point Mr. Sharma said that all three of them were working together?

A.    So I believe Mr. Mishra said that he was working with Mr. Anjum and Mr. Sharma.

33

Q.    Okay.  Where's Mr. Sharma?

A.    He's in India.

Q.    And where is Mr. Mishra?

A.    He is also in India.

Q.    Okay.  So we haven't -- other than them saying that, you don't have any corroboration -- you don't have -- other than them saying that, you don't know if that's true?

A.    Correct.  We just have the two of them saying it.

Q.    Right.  Okay.  I'm not sure if this was your word or Mr. Shah's word, but there was -- in some of these chats, I think you said it showed obvious fraud.

A.    I don't recall saying that.

Q.    So the chats that went to Exhibit 2 there --

THE COURT:  The chat says, just so we're clear so I can understand all this, which is the most important thing, it says (Reading), Bro, you wanted 7K from Michael, really?  And I'm guessing that's referring to the Lobo account.  (Reading) It's a scam transaction.  You want money from -- it's misspelled, form -- from the same account?  I don't do like that. That's called creating paper trail.  I hope you know that.

And then it says, (Reading) Abrar client responds.  Well, I appreciate your smartness here.

34

Whoever you are playing around to pay us the rest 4,250.

MR. FITZGERALD: Okay. All right.

Q. It's fair to say you don't know what Mr. Anjum's intent behind calling it smart was; right? You don't know if he was being sarcastic?

A. I do not.

Q. You do know he seemed to be agitated that the rest of the money wasn't coming forward; correct?

A. Yes.

Q. And he told you that the reason he was acting agitated to get the rest of the money was because Mr. Mishra, Prem Mishra, was hounding him for that money; correct?

A. Yes, he did.

MR. FITZGERALD: That's all, your Honor. Thank you.

THE COURT: All right. Any further questions?

MR. SHAH: No further questions, your Honor.

THE COURT: All right. You can step down, agent. Thank you, sir.

**END OF EXCERPT**

35

C E R T I F I C A T I O N

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Karen M. Wischnowsky

July 28, 2020

Date